**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

**JAMES R. CRUMEL,**

               **Plaintiff,**

**v.**                                                    **Civil Action No. 4:05cv31**

**HAMPTON UNIVERSITY,**

               **Defendant.**

## OPINION and ORDER

This matter comes before the court on the defendant's motion for summary judgment, filed on October 6, 2005. The plaintiff has responded and the matter is currently ripe for review. The court has reviewed the parties' supporting memoranda and attached exhibits and finds that a hearing is unnecessary for the resolution of the issues presented. For the reasons set out herein, the court **GRANTS** the defendant's motion.

### I. Procedural Background

On March 31, 2005, the plaintiff, James R. Crumel, filed a complaint against the defendant, Hampton University, alleging that the defendant discriminated against him by failing to provide reasonable accommodation for his disability, retaliated against him for making requests for such accommodation, and constructively discharged him in violation of the Americans with Disabilities Act ("ADA").

It appears from the complaint that, prior to initiating this action, the plaintiff did satisfy the jurisdictional requirements of filing a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC"). The EEOC determined that sufficient cause existed to believe that the plaintiff was denied reasonable accommodation and was constructively

1

discharged.[1] (See Amended Complaint Ex. A.) The plaintiff filed an amended complaint by counsel on June 2, 2005. The defendant filed its answer on June 9, 2005.

On October 6, 2005, the defendant filed its motion for summary judgment and submitted various deposition transcripts and affidavits relating to the plaintiff's employment at Hampton University and his alleged disability.  The plaintiff filed his response to the defendant's motion for summary judgment on October 20, 2005, which was past the deadline.  The defendant filed its reply brief on October 25, 2005. Thus, this matter is ripe for judicial resolution. The trial for this case was scheduled to begin on December 6, 2005. However, on November 16, 2005, the court notified counsel that the court would be granting the defendant's motion for summary judgment and that a written Opinion would be forthcoming.

## II. Factual Background

Certainly some of the facts giving rise to this lawsuit are disputed by the parties.  As the matter is before the court on the defendant's motion for summary judgment, the "plaintiff's version of the facts must be presented where the parties' versions conflict, at least to the degree that [the plaintiff's] allegations have support in affidavits, depositions or other documentary evidence."  Paroline v. Unisys Corp., 879 F.2d 100, 102-103 (4th Cir. 1989).  Accordingly, the facts summarized below, where disputed and unless otherwise noted, reflect the plaintiff's

---

[1]In its Memorandum in support of Summary Judgment, the defendant states that the plaintiff's retaliation claim is barred because the plaintiff did not file suit within 90 days of the March 11, 2004 EEOC right to sue letter, which found evidence to support the failure to accommodate and constructive discharge claims, but not the retaliation claim. Although the defendant may be wrong in its statement, the plaintiff makes no mention whatsoever in his response brief concerning his retaliation claim or rebutting the defendant's contention that the plaintiff's claim is barred. It is the plaintiff's burden to go further with his claim, and as no argument or evidence regarding retaliation has been submitted to this court, the plaintiff has failed to meet his burden. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (explaining that with regard to a motion for summary judgment, the non-movant must make a sufficient evidentiary showing on each element of its claims such that a jury could reasonably find in its favor).

version of events to the extent they find support in the record.

In January 2003, Hampton University, a private institution that is located in Hampton, Virginia and employs approximately 1200 employees, hired the plaintiff, James Crumel, as the tutor coordinator at the Student Services Center.  As the tutor coordinator, Mr. Crumel's duties included hiring tutors, pairing them with students, and following up on such matches to make sure that the tutoring was effective. The Student Services Center is located in Room 101 of Armstrong-Slater Hall. Room 101 consists of a suite of offices, which includes a receptionist area, a work room where student records are kept, a tutoring classroom, a computer lab, and three offices, including Mr. Crumel's office.

Before the plaintiff started working at the Student Services Center, Sonya Tuberville, a secretary in Room 101, told Ms. Jean Williamson, the plaintiff's supervisor and director of Student Support Services, that she thought that the air in the receptionist area of Room 101 was aggravating her asthma. As a result, Doretha Spells, the Vice President of Business Affairs and Treasurer for Hampton University, authorized Carlos Irizarry, Assistant Director of Physical Plant, to hire Sovereign Enterprises to conduct a test of the air quality in Room 101.

Sovereign Enterprises conducted its first air quality test in December 2002 in the reception area of Room 101. The study compared the mold levels indoors with the outdoor spore count. The result revealed an indoor mold count of 371 spores per meters cubed, as compared to 168 spores per meters cubed detected outdoors. Although the EPA has no Threshold Limit Values for airborne concentrations of mold or regulations for airborne mold contaminants, there are laboratory standards used to determine if there are high levels of mold in a room. Less than 5000 per meters cubed is normal, 5000 to 10,000 per meters cubed is possible contamination, and greater than 10,000 per meters cubed is gross contamination. As a result of this study,

Sovereign Enterprises made the following recommendations to improve the air quality:

- Check the mechanical room and roof for unsanitary conditions, leaks, or spills.
- Check duct liners and filters for change outs.
- Check and replace water stained ceiling tiles, wood surfaces and wall surfaces.
- Regulate room temperatures by controlling the humidity level with proper ventilations or engineering methods.
- Check behind furred out walls and wall laminates for mold. Then replace or clean any visible mold spores.

(See Def. Memo. In Support of Mot. For Summary Judgment ("Def. Memo."), Ex. A - "Indoor Air Quality Report".)

In response to these recommendations, the University cleaned and painted, repaired the motor in the HVAC system, put vents in the door to Room 101 to increase air circulation, replaced all discolored ceiling tiles, and replaced part of the floor.  However, the University did not check behind furred out walls and wall laminates for mold.  In March 2003, Sovereign Enterprises conducted a follow up air quality test and determined that the indoor mold spore count had significantly improved and was now considerably lower than the outdoor mold spore count.

On March 17, 2003, after the plaintiff had worked at the University for a few months, the plaintiff submitted the first of a series of letters to Ms. Williamson informing her that he was suffering from congestion and allergies and that his doctors had prescribed medications. The plaintiff also sent by certified mail copies of these letters to Mr. Frederick Turner, the Director of Human Resources, with cover letters attached in which the plaintiff attributed his conditions to the environment in Room 101.  (Williamson Dep. Ex. 2.)  On April 14, 2003, Dr. Ann P. Zilliox, the plaintiff's allergy specialist at the time, sent a letter to Mr. Turner to document the plaintiff's allergies and asthma and recommend that the plaintiff be moved to a "non-moldy Hampton

University building."[2] ( Jean S. Williamson Depo. Ex.6.)  On April 17, 2003, the plaintiff sent a letter to Mr. Turner requesting that he be moved to another work environment based on Dr. Zilliox's letter.

On April 21, 2003, shortly after the plaintiff sent this letter, Mr. Turner and Ms. Williamson met with the plaintiff in Room 101 to discuss the plaintiff's letter requesting that the University move him to another department. The plaintiff claims that Mr. Turner denied his request to be moved by telling him in a hostile and unprofessional tone that "I am not going to move you" and "you can move your stuff out the door." The plaintiff also informed Mr. Turner and Ms. Williamson that he had seen mold underneath a floor tile in the tutorial section of Room 101, and that the air quality test that had been performed previously had only been performed in the reception area, not in the area of Room 101 where the plaintiff's office was located.   On April 21, 2003, the plaintiff sent a letter to Mr. Turner documenting what the plaintiff claimed had occurred during this meeting and demanding that he be allowed to relocate as Sonya Tuberville had been allowed to do. The University again denied his request stating that the plaintiff's job duties needed to be performed at the Student Services Center where his supervisor and the student records were located.

Over the next few months, the plaintiff continued to submit letters and complaints to both Mr. Turner and Ms. Williamson concerning the environment in Room 101.  In response, the University spent $1,289.70 to purchase air purifiers with new HEPA filters for each office in Room 101. Furthermore, in July 2003, the University hired Sovereign Enterprises to conduct an

---

[2] Dr. Zilliox's letter fell short of attributing the plaintiff's conditions to his work environment. In fact, in a later letter to the plaintiff, Dr. Zilliox explains that she has no evidence that occupational mold exposure is the cause of his symptoms or that he is even allergic to mold or has asthma. However, because this is a motion for summary judgment, and the court must view the facts in the light most favorable to the plaintiff, the court will assume that the plaintiff is allergic to mold and has asthma.

additional air quality test in the office area of Room 101, the area where the plaintiff worked. Sovereign Enterprises collected samples of both Room 101 of the Student Services Center, the Human Resources Office, and the exterior of the Student Services Center, in order to compare the different areas. The test revealed that the total mold spore count for all areas of the Student Service Center combined was 2552 spores per meters cubed, which is still well below the less than 5000 per meters cubed laboratory standard for normal.

Specifically, the mold spore count for each area of Room 101 was as follows: Receptionist Area - 936, End of Hall - 559, Middle of Hall - 329, Tutoring Lab - 399, and Mezzanine - 329. The mold spore count in the Human Resources Office ranged from less than 7 to 14 mold spores per meters cubed. The outdoor level was 988 mold spores per meters cubed. Although the mold spore count between the two offices was very different, the report concluded that the "indoor air quality for . . .[both the Human Resources Office and the Student Services Center were] not considered grossly contaminated with mold." (See July 2003 Indoor Air Quality Report at 4.)

The report recommended that the University continue to check the mechanical room and roof for unsanitary conditions, leaks, or spills, continue to check duct liners and filters for change outs, continue to check and replace water stained ceiling tiles, wood surfaces and wall surfaces, regulate room temperatures by controlling the humidity level with proper ventilation or engineering methods, check behind furred out walls and wall laminates for mold and replace or clean any visible mold spores, provide fresh air movement throughout the office area by opening existing windows, and provide portable humidifiers in the rooms to regulate the room humidity. Again the University followed all of these recommendations, except it did not tear out the furred out walls, and, instead of humidifiers, it provided air purifiers.

Even after these measures, the plaintiff continued to write letters to both Ms. Williamson and Mr. Turner complaining about the environment in Room 101 and demanding to be relocated. On October 2, 2003, the defendant submitted his letter of resignation to Ms. Williamson. On March 31, 2005, the plaintiff filed a complaint against the University claiming violations of the Americans with Disabilities Act (the "ADA").

## II. Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).  The court must assess the evidence and draw all permissible inferences in the non-movant's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Nevertheless, the non-movant must make a sufficient evidentiary showing on each element of its claims such that a jury could reasonably find in its favor.  Celotex, 477 U.S. at 322.  While it is the movant's burden to show the absence of a genuine issue of material fact, Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the non-moving party's burden to establish its existence.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986).

The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in [its] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  The evidence that the non-moving party presents to this end must be more than a "mere scintilla."  Barwick v. Celotex Corp., 736 F.2d 946, 958-959 (4th

Cir. 1984).   In order for the non-moving party to survive summary judgment, it must present evidence that is "significantly probative."   Celotex Corp., 477 U.S. at 327.   If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249-250; Matsushita, 475 U.S. at 586 (noting that non-movant must show "more than . . . some metaphysical doubt as to the material facts").   District courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323-25).

Summary judgment does not require that no factual issues be in dispute.   To find against the moving party, the court must find both that the facts in dispute are material and that the disputed issues are genuine.   Only "facts that might affect the outcome of the suit under governing law" are material.   Anderson, 477 U.S. at 248.   A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.   Thus, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

### III. Discussion

Although summary judgment should be granted with caution in employment discrimination cases, there are occasions when such a disposition is appropriate.   See Hudson v. Southern Ductile Casting Corp., 849 F.2d 1372, 1376 (11th Cir. 1988).   The court finds that this case happens to present one.   In this case, the court finds that the defendant is entitled to summary judgment because the plaintiff is unable to establish that he is disabled as defined by the ADA, the University offered reasonable accommodations to the plaintiff, and the plaintiff

cannot establish a claim of constructive discharge. Accordingly, the plaintiff's claims fail to survive summary judgment.

A.     Disability under the ADA

In order to establish a prima facie case of failure to accommodate under the ADA, a plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001). Accordingly, the first question this court must address is whether the plaintiff has a disability as defined by the ADA.

A disability under the ADA can be alleged as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The plaintiff is proceeding under subsection (A) by claiming that his alleged disability substantially limits one or more of his major life activities. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

In his complaint, the plaintiff specifically states that the disability from which he suffers is "severe allergies." However, in his response to the defendant's motion for summary judgment, the plaintiff states that his disability is "asthma". Although it is questionable whether the plaintiff actually has an allergy to mold[3], in order to construe the facts in a light most favorable

_____

[3] The court has great concern about the fact that the medical report from Dr. Leo Carter, dated July 25, 2005 and obtained by the defendant pursuant to a subpoena duces tecum, does not have any results circled. However, the same report, submitted by the plaintiff through counsel, which is attached as the fifth page of Exhibit 2 to his response to the motion for summary judgment,

to the plaintiff, the court will assume for purposes of this motion that the plaintiff is allergic to mold and has asthma.

The plaintiff claims in his complaint that his allergies and asthma substantially limit his "breathing and working under certain conditions."  With respect to working, "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Id. at  § 1630.2(j)(3)(I). However, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

In Rhoads v. FDIC, 257 F.3d 373 (4th Cir. 2001), the Fourth Circuit held that the plaintiff, who had a cigarette smoke allergy and smoke induced migraines, was not disabled within the meaning of the ADA.  The court explained that the plaintiff "failed to make a sufficient showing that she was substantially limited in her ability to work, where she has established only that she was unable to function in one particular smoke-infested office." Id. at 388.  Furthermore, "'there appear[ed] to be no reasonable material or relevant factual dispute concerning [Rhoads's] ability to perform her job requirements at a very high level, provided that she is given the opportunity to perform her work in a smoke-free atmosphere . . . .'" Id. (quoting Rhoads v. FDIC, 956 F. Supp. 1239, 1246 (D. MD. 1997)). Hence, the court found that the plaintiff had "not shown, as required, that she is generally foreclosed from jobs utilizing her

---

has circles on it indicating the plaintiff's allergies. Plaintiff's counsel is to explain to this court by letter within ten (10) days from the date of this order why the reports differ, if he knows. In addition, plaintiff's counsel will submit an affidavit from Dr. Carter as to why the report was not filled out when submitted in response to the subpoena duces tecum, but filled out when the plaintiff submitted it to this court.

The court also notes that the plaintiff's medical records from Dr. Weixler, his primary physician at the time he was employed at the University, and  Dr. Zilliox state that the plaintiff did not test positive for mold allergies. (See James Crumel Dep., Ex. 13, 15, and 16.)

skills because she suffers from smoke-induced asthma and migraines." <u>Id.</u> Accordingly, the court affirmed the grant of summary judgment in favor of the defendant on the plaintiff's failure to accommodate claim.[4] <u>See also</u> <u>Sutton v. United Air Lines</u>, 527 U.S. 471, 492 (1999) (finding that "[t]o be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice.")

In this case, the plaintiff does not claim, nor does he show, that he is significantly restricted in his ability to perform a broad range of jobs. In fact, the plaintiff contends that he would be capable of performing his duties in a different building on the Hampton University campus. In other words, the plaintiff is simply unable to perform his duties in Room 101 of the Student Services Center.   Therefore, there is no material factual dispute as to whether the plaintiff can perform his duties in a mold-free environment. Accordingly, he has failed to make a sufficient showing that he is substantially limited in his ability to work.

The plaintiff claims that <u>Rhoads</u> is inapplicable to his case because the plaintiff's condition is not aggravated solely by his workplace environment. However, the court finds this argument unpersuasive given the fact that in <u>Rhoads,</u> the court based its decision on the fact that there was no reasonable dispute that the plaintiff could perform her job requirements provided that she was given a smoke-free environment. <u>Id.</u> at 388. Likewise, in this case, there is no dispute that the plaintiff could adequately perform his job in a mold-free environment, as evidenced by the plaintiff's own statement in his affidavit to this court.

The plaintiff also claims that he is substantially limited in the major life activity of breathing. In <u>Sutton v. United Air Lines</u>, 527 U.S. 471 (1999), the Supreme Court held "that disability under the Act is to be determined with reference to corrective measures." <u>Id.</u> at 488.

---

[4] However, the court reversed the district court as to Rhoads's retaliation claim.

11

In other words, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures -- both positive and negative -- must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act." Id. at 482.

In this case, the record shows that the plaintiff's allergies and asthma are alleviated with the use of medication. Specifically, Dr. Zilliox noted in her April 7, 2003 report and letter to Dr. Weixler, who was the plaintiff's primary doctor at the time, that the plaintiff "feels much better w[ith] routine meds" and exhibits "great improvement". (James Crumel Dep., Ex.13, 15.) In addition, Dr. Weixler stated in a letter to Charlene Brown, the plaintiff's attorney for his Worker's Compensation claim, that the plaintiff's seasonal allergies and asthma had "cleared significantly better once he used an inhaler, nasal spray with steroids, and eye drops."[5] (James Crumel Dep., Ex.16.; see also Analysis of Medical Records Pertaining to the Healthcare of Mr. Crumel at 3.)

However, the plaintiff, in response to the defendant's motion for summary judgment, claims that his conditions cannot be successfully controlled with medications. The plaintiff cites to his own affidavit to support this claim. Yet, his affidavit makes no mention of the effect of medications and simply states that he still suffers from allergy symptoms today. (James Crumel Aff. ¶ 4.) To defeat summary judgment, the plaintiff must present admissible evidence that is more than self-serving opinions or speculation. See McCain v. Waste Mgmt., 115 F. Supp. 2d 568, 574 (D. Md. 2000).  The plaintiff's medical records that the defendant submitted to this court clearly show that the plaintiff's condition, at the time of his employment, was successfully

---

[5] Interestingly, this same letter states that Dr. Weixler found that the plaintiff did not test positive for mold sensitivity. However, as stated above, the court assumes for purposes of this motion that the plaintiff is allergic to mold.

controlled with medication.  Accordingly, the plaintiff has failed to show that his major life activity of breathing is substantially limited.

In his response memorandum, the plaintiff cites Carter v. Tisch, 822 F.2d 465, 466-67 (4th Cir. 1987) to support his contention that asthma is a disability under the ADA. However, Carter did not address the issue of what constitutes a disability under the ADA. Although the court seemed to assume that the asthmatic plaintiff in Carter had a disability, the only issue on appeal was whether it was reasonable accommodation for an employer to assign the plaintiff to a light duty position when such an assignment was in direct conflict with a collective bargaining agreement.  Although the court does not doubt that in some situations severe asthma does constitute a disability under the ADA, the court finds Carter unpersuasive in light of the evidence in the instant case that the plaintiff is not substantially limited in a major life activity.

Because the plaintiff is unable to show that his major life activities of working and breathing are substantially limited, he is unable to demonstrate that he is disabled under the ADA.  In his response to the defendant's motion for summary judgment, the plaintiff further claims that his major life activities of sleeping and "walking under certain conditions" are also restricted, even though his complaint only claims that his major life activities of "breathing and working in certain conditions" are limited. (James Crumel Aff. ¶ 4.) However, again the plaintiff provides no support for this claim other than his own self-serving affidavit. Furthermore, even assuming that the plaintiff could demonstrate that his sleeping and walking were substantially limited due to his allergies and asthma, he has not provided sufficient evidence to refute the medical evidence that his condition is successfully treated with medication. Accordingly, the court finds that the plaintiff is not disabled under the ADA because he cannot demonstrate that he is substantially limited in a major life activity.

13

B.      Reasonable Accommodation

Even if the court were to assume that the plaintiff has a disability under the ADA, his claim would still fail because the University provided reasonable accommodations.  The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Id. at (b)(5)(A).

As stated above, in order to state a prima facie case for failure to accommodate under the ADA, a plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001). However, when providing reasonable accommodation, an employer is not required to provide an employee with the specific accommodations requested.   EEOC v. Newport News Shipbuilding and Drydock Co., 949 F. Supp. 403 (E.D. Va. 1996); see also Harmer v. Virginia Elec. & Power Co., 831 F. Supp. 1300, 1306-07 (E.D. Va.1993).

In Newport News Shipbuilding and Drydock Co., the plaintiff claimed that he was particularly susceptible to mold in the work place because of his HIV status. Id. at 404-06. The plaintiff sued his employer claiming that his employer failed to provide him reasonable accommodation by forcing him to move to a new building with the rest of the employees in his department. Id.   Originally, the plaintiff was located in building number 78. However, he

14

requested to be moved to building 161 where he felt he could better control the air quality of his environment. Id.  His employer approved this initial move and allowed the plaintiff to work in building 161, which is a different building from the rest of the employees in his department. Id. The employer allowed the plaintiff to stay in building 161 for several years. Id.  However, when the plaintiff's department moved to building 29 because of downsizing, his employer insisted that it was now necessary for the plaintiff to move into building 29. Id.

The plaintiff moved to building 29, but claimed that the new environment was contributing to his allergies. Id. In response, his employer conducted tests of the air quality in building 29 and allowed the plaintiff to go on short term disability during this time. Id. The results of the testing showed that the mold levels in building 29 were lower than those in building 161, the building from which the plaintiff had not wanted to move. Id. Nonetheless, the employer made several improvements to building 29 to try to improve the air quality. Id. Such measures included the following: "(1) standing water outside the building was removed and the underlying drainage problem was fixed; (2) moisture was removed from the ceiling; (3) a leak in the water fountain was repaired; (4) the air conditioning units and ductwork were cleaned; and (5) new air filters were installed." Id.  After taking these measures, the employer tested the air quality again and found it had substantially improved and that the plaintiff could return to work. Id.

The plaintiff returned to work but was later moved to yet another building as a result of changes in the department. Id. However, before moving the plaintiff, the employer installed a new air conditioning unit and thoroughly cleaned and painted the plaintiff's new office. Id. The plaintiff sued the employer claiming that his employer had failed to accommodate his alleged disability by forcing him to move from building 161 and placing him on short term disability,

rather than simply allowing him to stay in his old building. Id. at 407.

This court granted summary judgment in favor of the defendant, finding that even if the plaintiff qualified as having a disability under the ADA, his employer made reasonable accommodations. Id. at 407-09. The court explained that "the Company [wa]s not required to provide O'Donnell with the specific 'accommodation he may request, but only with reasonable accommodation as is necessary to enable him to perform his essential functions.'" Id. at 408 (quoting Harmer, 831 F. Supp. at 1306). The court found that the company had been more than reasonable in its accommodations by "maintain[ing] a dialogue with O'Donnell's physician, follow[ing] his recommendations and ma[king] numerous improvements to O'Donnell's work environment." Id. at 409. Furthermore, the court explained that a letter from the plaintiff's doctor requesting that the plaintiff not be moved from building 161 was not sufficient to raise a genuine issue as to a material fact because the plaintiff's doctor had no knowledge of the air quality in the building and was making this request based solely on the information provided by the plaintiff. Id. at 407-08.

In Harmer v. Virginia Elec. & Power Co., the plaintiff suffered from a severe pulmonary disability, which "substantially limit[ed] his ability to care for himself, his ability to breathe, his ability to walk and his life expectancy." Id. at 1303.  He requested his employer to implement a complete ban on smoking in his work environment. Instead, the employer "provided fans, smokeless ashtrays and air purifiers and . . . moved employees to increase the space between smokers and nonsmokers." Id.  In addition, the company "prohibit[ed] smoking in the rest rooms, conference rooms and hallways on the twelfth floor and limit[ed] smoking to the smoker's cubicle." Id. The company even offered the plaintiff the opportunity to transfer to another office, which the plaintiff declined. Id.  Furthermore, the company conducted an air quality test and

16

found that the levels of carbon dioxide were below the recommended maximum, indicating sufficient fresh air in the environment. Id.

The plaintiff sued his employer for not accommodating him by implementing a complete ban on all smoking, which was his requested accommodation. However, this court granted summary judgment to the employer finding that there was no material fact in dispute upon which a jury could find that his employer did not reasonably accommodate the plaintiff. Furthermore, the court explained that the plaintiff was not entitled to an absolute accommodation, such as a complete smoking ban, because he could not show that he was unable to perform the essential functions of his job absent a complete ban, as evidenced by his positive job performance evaluations. Id. at 1306. The court explained that "the purpose of reasonable accommodation is to allow a disabled employee to perform the essential functions of his job or to enable him to enjoy equal privileges of nondisabled employees" and in Harmer's case,"[n]o evidence ha[d] been offered to suggest that Harmer's productivity was not comparable to that of other employees." Id. (citations omitted.)

In this case, even assuming *arguendo* that the plaintiff is disabled under the ADA, the court finds that the University reasonably accommodated the plaintiff. In response to the plaintiff's complaints, the University hired Sovereign Enterprises to conduct an air quality test in the office area of Room 101. The test revealed that the total mold spore count for all areas of the Student Service Center was well below the less than 5000 per meters cubed laboratory standard for normal mold levels. Furthermore, the report concluded that the "indoor air quality for . . .[both the Human Resources Office and the Student Services Center were] not considered grossly contaminated with mold." (See July 2003 Indoor Air Quality Report at 4.)

Nonetheless, the University implemented all of the recommendations that Sovereign

Enterprises made in its air quality report that were possible without placing undue hardship on the University. Specifically, the University continued to check the mechanical room and roof for unsanitary conditions, leaks, or spills, continued to check duct liners and filters for change outs, continued to check and replace water stained ceiling tiles, wood surfaces and wall surfaces, regulated room temperatures by controlling the humidity level with proper ventilation or engineering methods, and provided fresh air movement throughout the office area by opening existing windows.  In addition, the  University purchased air purifiers with new HEPA filters for each office in Room 101. The only recommendation that the University did not accomplish was tearing out the furred out walls and wall laminates to check behind them for mold. However, in light of the acceptable results of the air quality test, the decision to refrain from destroying the building to accommodate the plaintiff was certainly reasonable.

The plaintiff claims that the fact that Ms. Williamson had previously allowed Sonya Tuberville, a secretary in Room 101, to relocate to a different building on campus shows that the University failed to reasonably accommodate him by refusing to give him the option of relocating. However, this court disagrees with the plaintiff's argument. Although Ms. Williamson allowed Ms. Tuberville to temporarily relocate to another building, such relocation was terminated when Doretha Spells, the Vice President of Business Affairs, learned of such relocation.  Ms. Spells told Ms. Williamson that Ms. Williamson did not have the authority to allow such relocation and that Ms. Tuberville would have to return to the Student Service Center to perform her duties. (Doretha Spell Aff. ¶ 9.)  The fact that Ms. Tuberville was forced to move back to the Student Services Center is consistent with Mr. Turner's assertion that "the Student Support Service unit cannot function appropriately with a staff fragmented across the University campus." (Turner Dep. Ex. 1.)

Furthermore, similar to the doctor's opinion in <u>Newport News Shipbuilding and Drydock</u>, Dr. Zilliox's letter stating that the plaintiff should be moved to another location, does not raise a genuine issue of material fact because Dr. Zilliox based her assessment solely on information provided by the plaintiff that the environment was causing his symptoms. Furthermore, in her October 31, 2003 letter to the plaintiff, Dr. Zilliox reprimanded the plaintiff for asserting that she encouraged him to file legal actions under the Worker's Compensation Act and the ADA.  (Def. Memo. in Support of Summary Judgment, Ex. 5 - James Crumel Dep., Ex. 17.)  Instead, Dr. Zilliox explains that she distinctly advised him against such action because she had no evidence that occupational mold exposure was the cause of his symptoms or that he is even allergic to mold or has asthma.  (<u>Id.</u>) Dr. Zilliox explains that she only wrote her vague letter to the University recommending that the plaintiff be moved to a new location because the plaintiff said such a move was "plausible and likely with a physician's recommendation." (<u>Id.</u>) She explained that her decision to write the letter was based on the fact that a moldy work environment would not be appropriate for anyone, not because she had any evidence that the plaintiff was actually allergic to mold or that his symptoms were caused by his environment. Thus, in light of the measures taken by the University to accommodate the plaintiff, the court finds that there is no genuine issue of material fact that could lead a jury to find that the University failed to accommodate the plaintiff.

C.     Constructive Discharge

Finally, the plaintiff claims that he was constructively discharged from his position at Hampton University. In the Fourth Circuit, "the standard for constructive discharge requires a plaintiff to show both intolerable working conditions and a deliberate effort by the employer to force the employee to quit." <u>Johnson v. Shalala</u>, 991 F.2d 126, 131 (4th Cir. 1993) (citing <u>Bristow</u>

v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). "Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment." Id. (citing EEOC v. Clay Printing Co., 955 F.2d 936, 944-46 (4th Cir. 1992)). Furthermore, the Fourth Circuit has held that inadequate accommodations may defeat a claim of constructive discharge. Id. at 132. In other words, if an employer in good faith attempts to accommodate a disabled employee, but fails to sufficiently meet the employee's requested needs, then an employee cannot show constructive discharge absent "direct evidence that an employer intended to force the employee from his . . .  job." Id. at 132; see also Yeung v. Loudoun Co. Public Schools, 2003 WL 2331426 (E.D.Va. 2003) (denying claim of constructive discharge when employer school assigned the allegedly disabled employee to two connecting classrooms, instead of allowing her to remain in one classroom as she requested).

In this case, even if the court assumes that the plaintiff could show that the conditions in Room 101 were intolerable, he would not be able to satisfy the deliberateness element because the University attempted to accommodate the plaintiff. After learning about the plaintiff's complaint, the University ordered an air quality test and report and implemented all of the recommendations in such report that would not cause the University undue hardship.

The plaintiff claims that Mr. Turner's alleged comments on April 21, 2003, which were "I am not going to move you" and "you can move your stuff out the door", prove that the University tried to deliberately force him to quit. However, one remark from a supervisor made in frustration more than six months before the defendant resigned is not sufficient to create a genuine issue of material fact that the University deliberately tried to drive the plaintiff from his position, given the fact that, after Mr. Turner allegedly made these comments, Mr. Turner

20

attempted to further accommodate the plaintiff.

Specifically, on April 25, 2003, Mr. Turner wrote a letter to the plaintiff setting forth the further efforts that the University would make to improve and maintain the air quality in Room 101. In addition, the University purchased air purifiers with new HEPA filters for each office in Room 101, conducted an additional air quality test in July 2003, and implemented most of the recommendations suggested in the air quality report. After the University repeatedly attempted to accommodate the plaintiff within the bounds of what would not cause undue hardship to the University, the plaintiff chose to resign from his position in October 2003. Such attempts to accommodate the plaintiff, defeat the plaintiff's claim of constructive discharge.

In addition, the plaintiff claims that Ms. Williamson questioned the plaintiff as to why he would continue putting his body through the environment and why he was not looking for another job. He states that Mr. Turner also stated to Ms. Tuberville that if he, Mr. Turner, were suffering from the conditions afflicting both Ms. Tuberville and Mr. Crumel, that he would quit. The plaintiff claims that such statements raise a genuine issue as to a material fact on the issue of the plaintiff's constructive discharge claims.

However, in <u>Spain v. Mecklenburg County Sch. Bd.</u>, 2001 U.S. Dist. LEXIS 11217 (ED.Va. 2001), the court held that similar comments made by the plaintiff's supervisor did not constitute constructive discharge. In <u>Spain</u>, the plaintiff was demoted and someone beneath him assumed his previous supervisory position. The employee who replaced the plaintiff allegedly stated that the plaintiff was "handling the reassignment better than she would . . . if what happened to [Plaintiff] happened to [her,] she would be mad and quit." <u>Id.</u> at * 22-23. Furthermore, the supervisor stated to the plaintiff that she expected him to leave. <u>Id.</u>  The court explained that because the plaintiff had made his displeasure in his job a public discussion at the

work place, such comments made by his supervisor were "objectively benign" and were not "calculated efforts to force him to resign." Id. at * 24. In this case, the court finds that the comments made by Ms. Williamson and Mr. Turner were also objectively benign and were not calculated efforts to force him to resign. The plaintiff in this case, like the plaintiff in Spain, had discussed his dissatisfaction with his work environment on numerous occasions with his supervisors. For his superiors to make such comments to the plaintiff, knowing that they had done everything within their power to try to accommodate him, cannot be seen as attempts to force him to quit, but simply neutral observations in response to his repeated complaints. Accordingly, the plaintiff fails to set forth evidence of constructive discharge.

## IV. Conclusion

The evidence produced by the non-movant must create a fair doubt as to the nonexistence of a genuine issue for trial. "[W]holly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). As the court cannot engage in the speculation, the court must find that the plaintiff has not offered evidence to satisfy his burden of production to forecast evidence to each essential element of his claims for failure to accommodate, constructive discharge, and retaliation. Celotex Corp., 477 U.S. at 322 (noting that summary judgment is appropriate when party fails to make showing sufficient to establish existence of element essential to party's case and on which party bears burden of proof at trial).

The court concludes, then, that the defendant has carried its burden of establishing that, even viewing the record in the light most favorable to the plaintiff, no genuine issues of material fact exist in this case. Celotex Corp., 477 U.S. at 322-324. The plaintiff has failed to set forth

any evidence establishing the existence of a triable issue.  <u>Bradford v. School Dist.</u>, 364 F. 2d

185, 187 (4th Cir. 1966).  Furthermore, the court finds that the defendant has demonstrated the

"absence of evidence to support the non-moving party's case."  <u>Celotex Corp.</u>, 477 U.S. at 324.

 The court finds that the plaintiff has not produced any evidence to permit a rational fact finder

to conclude that the University failed to accommodate him, retaliated against him, or that he was

constructively discharged.   Accordingly, due to the plaintiff's failure to present evidence to

create genuine issues of material fact, the court **GRANTS** the defendant's motion for summary

judgment.

In addition, the court **ORDERS** plaintiff's counsel to submit to this court by letter within

ten (10) days from the date of this order an explanation as to why the medical reports from Dr.

Leo Carter differ, if he knows, along with an affidavit from Dr. Carter as to why the copy of the

report that was submitted in response to the subpoena duces tecum does not have circles on it,

but the report submitted to this court by the plaintiff does. If Dr. Carter made the circles on the

report, his affidavit should explain when such circles were made and why there was a delay in

filling out the report.

The Clerk is **REQUESTED** to mail copies of this order to counsel for all parties.

**IT IS SO ORDERED.**


                                    _____
                                            /s/
                                    Jerome B. Friedman
                                    UNITED STATES DISTRICT JUDGE


Norfolk, Virginia
December 8th, 2005